AO 91
Rev. 11/97

**CRIMINAL COMPLAINT**

**ORIGINAL**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>ADONIS GLADNEY | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>08- **08 1124M** |

Complaint for violation of 18 U.S.C. § 1341 and 28 U.S.C. § 2461(c), 18 U.S.C. § 981(a)(1)(C) & 21 U.S.C. § 853 (Criminal Forfeiture)

| NAME OF MAGISTRATE JUDGE<br>HON. JENNIFER T. LUM | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, CA |
|---|---|---|
| DATE OF OFFENSE<br>March 14, 2006 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN)<br>390 S. Hauser Blvd., Tower 46, Apt. 8-D, Los Angeles, CA 90036 |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION :

On or about March 14, 2006, defendant ADONIS GLADNEY, in Los Angeles County, within the Central District of California, and elsewhere, knowingly devised, attempted to devise and participated in a scheme to defraud and to obtain money from computer software purchasers, by means of materially false and fraudulent pretenses, representations and promises.

The government also seeks forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to one or more violations of 18 U.S.C. Section 1341, including, without limitation, $74,038 in cash and two replica Lamborghini automobiles seized from defendant ADONIS GLADNEY.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Jason Smolanoff |
|---|---|
| | OFFICIAL TITLE<br>SPECIAL AGENT – FBI |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br>May 9, 2008 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.
CHM:chm        REC: $50,000 secured (Warrant)

## A F F I D A V I T

I, Jason N. Smolanoff, being duly sworn, hereby depose and state:

1.  I am employed as a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") and have been so employed since 1999. I am currently assigned to the Los Angeles Field Division Cybercrimes Squad, which is responsible for investigating computer and high-technology crimes, including those relating to intellectual property offenses.

2.  During my career in the FBI, I have participated in investigations involving computer-related offenses, and have assisted with the execution of over fifty search warrants, the vast majority of which have involved searches and seizures of computers, computer equipment, software, and electronically stored information. I have received training in computer-related investigations and related issues from the FBI and private computer security companies, and have interviewed numerous individuals who have used computers in connection with criminal activity.

3.  I make this affidavit in support of a complaint and arrest warrant charging ADONIS GLADNEY (hereinafter "GLADNEY") with a violation 18 U.S.C. § 1341 (mail fraud) and 28 U.S.C. § 2461(c), 18 U.S.C. § 981(a)(1)(C) & 21 U.S.C. § 853 (criminal forfeiture).

## Background

4. As described more fully below, at its core GLADNEY's scheme to defraud involved using the Internet and the mails to defraud unsuspecting buyers into believing they were purchasing legitimate software products.

5. By way of background, for software purchased on the open market, a software company (such as Microsoft, Adobe, or Symantec) ordinarily manufactures the product and packages it with the appropriate documentation, including a license to use the software and a certificate of authenticity. It then sells the software to a third party who, in turn, resells it over the Internet or at a brick-and-mortar store, for example. For individual buyers, the customer receives both the software, which is contained on one or more CD-Rom discs, and the related documentation (hereinafter together referred to as the "full retail version").

6. In the case of multiple users, sale of the software can work in a slightly different fashion. Using Microsoft as an example, Microsoft develops, promotes, advertises, markets, distributes and licenses computer software programs. Among Microsoft's many computer programs are Microsoft Windows Server 2003, Microsoft SQL Server 2000 and Microsoft Office 2000. Microsoft distributes this software for sale to the public in a package with several components, including, among other things, diskettes and/or CD-ROM, an accompanying "end user license

agreement," a certificate of authenticity, and packaging materials. Customers interested in using multiple copies of a certain type of software need not purchase a large number of the packaged software and materials. Instead, such customers have the option of purchasing software with additional licenses -- one type of which is referred to as a "client access license" or "CAL" -- to enable access by additional users. Such software is typically referred to as "volume licensed" software. A CAL authorizes multiple users or devices to access a single copy of software that is installed on a computer mainframe or server configuration. A CAL is required for each user or device (or combination of both) that accesses or uses the software and is accompanied by documentation authorizing the use of particular software. Thus, a business may purchase a single software package, which only authorizes a single user, and may also purchase additional license rights which authorize the business to install and operate the software on a specified number of additional computers for a specified number of additional users.

7. Software product activation is intended to deter individuals from violating software copyright laws and unauthorized copying of protected intellectual property (for example, installing multiple copies of a computer program in violation of the licencing agreement). Product activation has many different levels of complexity, but in the case of the Microsoft Windows XP operating system, product activation is

3

achieved using a software algorithm (included in the software) and a product key code (typically found printed on a COA). The algorithm is simply a mathematical function that uses the product key code to create a unique number, that is transmitted via the Internet, to a Microsoft authentication server. If the key code is authentic, the Microsoft authentication server will transmit a signal activating the software. If the key code is not valid, the software will not fully install on the computer and will wait for a valid key code entry. A typical Microsoft Windows XP product key code is comprised of a combination of 25 integers and alphanumeric symbols. All new purchases of Microsoft Windows XP software include a compact disk (containing the software), an end-user license agreement, a warranty card, and a product activation code (key code). In the case of Microsoft Windows XP software, an authentic product key code will be printed on a certificate of authenticity (COA) that is typically displayed on a computer case.

     8. As discussed in more detail below, GLADNEY's scheme involved defrauding both individual purchaser/users as well as volume licensed purchasers. For individual purchaser/users, GLADNEY would advertise for sale what purported to be full retail version software but then mail something else. In the multi-user context, GLADNEY typically sold a single CD-Rom disc containing the desired software and included with it what purported to be a legitimate CAL/product activation code for the requested number

of users that would enable access to the software. In reality, the CAL/product activation code GLADNEY provided was either counterfeit (generated by a computer code counterfeiting program) or otherwise obtained improperly without authorization from the software manufacturer. In either case, the purchaser would use the product activation code to run the software when it had no right to do so.

9. In the present scheme, the software GLADNEY sold may have taken a variety of forms but in each instance he did not have the right to resell the software as legitimate full retail versions. Some examples of the software GLADENY improperly misrepresented to be full retail version software would include the following:

    i. Academic software are versions of software titles sold to students or universities at significantly lower prices than the full retail versions even though there is no difference in content between the academic and retail versions. Academic software is typically altered to deceive a customer that it is a Full Retail Version.

    ii. Microsoft Volume Licensing Not for Resale compact disks (CD-ROMs) refers to supplemental CD-ROMs and user manuals that Microsoft offers only to customers that have already acquired a license for that particular product. These supplemental products are not offered by Microsoft to the general public as retail software. These products not authorized by

Microsoft for distribution as a stand alone product by software resellers. Only Microsoft can enter into a "Volume Licencing" agreement with a customer.

    iii. NFR or "Not For Resale" is a designation that Microsoft uses to identify their software products that may not be sold or otherwise transferred for value, or used for any purpose other than demonstration, test or evaluation.

### Underlying Investigation

  10. On or about August 2005, I was contacted by Microsoft Investigator Thomas Montgomery who told me that Microsoft Corporation has been conducting an anti-piracy investigation regarding AG SOLUTIONS since 2002. Information obtained during Microsoft's investigation, as related to me by Montgomery, regarding AG SOLUTIONS is summarized below:

    a. AG SOLUTIONS, aka AG Solutions PC, is associated with several different contacts and addresses, including ADONIS GLADNEY at 390 S. Hauser Blvd, Tower 46 Apt. 8-D, Los Angeles, CA 90036. AG SOLUTIONS uses, among others, the telephone numbers 888-206-9107 and 323-908-3351.

    b. AG SOLUTIONS uses the Internet website, www.agsolutionspc.com to sell software and computer license products. AG SOLUTIONS uses multiple e-mail addresses, including guaranteedgoodquality@hotmail.com.

    c. Between September 2002 and August 2005, Microsoft received 226 total reports regarding suspect counterfeit software

6

sales from AG SOLUTIONS, 207 of which related to Internet sales. A portion of the suspect sales are from the Internet website www.agsolutionspc.com. The reports are made by customers, Microsoft investigators, and Law Enforcement.

        d.  Microsoft, and/or their authorized agents, routinely analyze software to determine if it is genuine and authentic. The suspect software is typically submitted by Microsoft investigators, law enforcement, and/or customers. To date, Microsoft has analyzed approximately 18 different software submissions (from Microsoft Test Purchases, Customer Submissions, and Law Enforcement) for software purchased from AG SOLUTIONS. Microsoft and/or their authorized agents, have determined that 17 of the 18 software submissions were unauthorized distributions of non-genuine Microsoft software products.

        11.  In light of the information obtained from Microsoft and from another investigation involving counterfeit software, I directed a confidential source ("CS-1") to contact GLADNEY. Through consensually recorded telephone calls to which I have listened, CS-1 confirmed that GLADNEY is and has been the owner and operator of AG SOLUTIONS.

        12.  On or between May 13, 2005 and February 7, 2006, CS-1, acting at my direction, contacted GLADNEY using his business and mobile telephone numbers. During almost all of the telephone calls with CS-1, GLADNEY discussed the procurement and distribution of unauthorized Microsoft product activation key

7

codes and Microsoft NFR software products.

13. On or about May 18, 2005, CS-1 spoke with GLADNEY at (888) 206-9107 (the telephone number associated with AG SOLUTIONS). During this telephone call, among other things, GLADNEY offered to sell CS-1 Microsoft Windows 2000 Server software CDs with "integrated" 5 CALs ("Client Access Licenses") and key codes, but no certificate of authenticity ("COA") labels. GLADNEY further advised that he could procure Microsoft SQL Server products. GLADNEY repeated that he was selling these products without COA labels. GLADNEY explained to CS-1 that he was aware of the new law regarding the illegal sale of stand-alone COA labels.

14. In my training and experience, a legitimate computer software reseller would not sell software products without the COA labels that would normally be packaged with the product by the manufacturer. The COA label is a certificate of authenticity from the manufacturer that certifies the product is genuine and provides an assurance to the customer that their purchase is legitimate. Additionally, I have been informed by Microsoft representatives that Microsoft products do not have "integrated" CALs, all legitimate CALs are provided as a separate paper document with the associated product (for example Windows 2000 Server).

15. On or about May 19, 2005, CS-1 received a voice mail message from an individual who identified herself as SANDRA, an

8

employee of AG SOLUTIONS.  SANDRA stated in her message to CS-1 that the shipping address for AG SOLUTIONS, as well as the address to send payments for products, was 390 S. Hauser Blvd, Tower 46 Apt. 8-D, Los Angeles, CA 90036, which was GLADNEY's residence.

16.  On or about May 27, 2005, CS-1 spoke with GLADNEY at (888) 206-9107 (the telephone number associated with AG SOLUTIONS).  During this telephone call, among other things, GLADNEY discussed purchasing 300 to 500 Microsoft Office 2003 Professional NFR software CDs from CS-1.  GLADNEY asked CS-1 what type of NFR CDs CS-1 was selling, such as, "full hologram," volume licensing, or academic.  GLADNEY explained to CS-1 that he needed not just the disc, but a packaged stand-alone product.  GLADNEY also told CS-1 that all of the NFR CDs he is buying need to have a product activation key code, but that they could all use the same key code.

17.  In my training and experience, a legitimate computer software reseller would not attempt to procure NFR products, as they are not authorized or licensed for resale by definition.  Further, a legitimate reseller would not need to discuss the presence of security features, such as the "full hologram," on products if they were purchasing genuine products from an authorized supplier, nor would a legitimate reseller need to discuss whether they were receiving volume licensing or academic versions of a product unless they were specifically ordering

9

these types of products which are authorized for limited distribution. Finally, when GLADNEY explained that he needed products key codes, even if they were all the same, on the software he was attempting to buy, he was confirming that he was aware that the products may not be genuine products with the COA label and product key code that are normally attached by the manufacturer. For a legitimate NFR Microsoft software product, a specific key code is assigned to a specific company and/or organization. Key codes assigned for NFR software are unique for each customer and are not transferable since they are related to a defined number of user licences.

18. On or about August 3, 2005, CS-1 spoke with GLADNEY at (323) 509-8323 (GLADNEY's mobile telephone number). During this telephone call, among other things, GLADNEY discussed purchasing Microsoft Office 2003 NFR software from CS-1 and others for resale. GLADNEY told CS-1 that he just received a cease and desist letter from Microsoft about selling WWF (Worldwide Fulfillment) software. GLADNEY told CS-1 that he needed to "figure out what to do" about the letter and that he would probably start another website. GLADNEY told CS-1 that he uses the same products key codes "over and over" with the software products he distributes to his customers. GLADNEY asked CS-1 if he/she had access to obtaining product key codes. GLADNEY explained to CS-1 that the Microsoft Server software products that he sells, do not require a key code to install but, for

other products that do require a key code, he just uses one key code repeatedly for each of the Microsoft software product lines that he sells.

19. In my training and experience, I know that it is a common tactic among illicit software resellers to relocate their business or website after receiving cease and desist letters from software manufacturers regarding counterfeit or unauthorized software distribution. AG SOLUTIONS did in fact create a new website sometime between August 2005 and January 2006 and relocated the company's Internet business from www.agsolutionspc.com to www.abovegroundsolutions.com.

20. Further, in my training and experience, when GLADNEY discussed key codes as described above, he was referring to Microsoft's product activation key codes that are typically printed on a Certificate of Authenticity (COA) label and placed on genuine products by the manufacturer as a means to deter software piracy and verify that only genuine products can be activated by the consumer. By repeatedly using and distributing the same key codes on multiple products, GLADNEY was circumventing one of Microsoft's primary security features for legitimate product activation.

21. On or about February 7, 2006, CS-1 spoke with GLADNEY at (888) 206-9107 (the telephone number associated with AG SOLUTIONS). During this telephone call, among other things, GLADNEY discussed purchasing 100 pieces of Microsoft NFR software

11

from CS-1. GLADNEY discussed pricing with CS-1 and agreed to purchase 50 Microsoft Windows XP Professional NFR and 50 Microsoft Office 2003 Professional NFR software CDs from CS-1. GLADNEY discussed his difficulty in obtaining Microsoft product key codes and told CS-1 that, if they did "good business," he could give one key code to CS-1. GLADNEY stated that he only had three key codes at the time and would be interested in obtaining more. GLADNEY told CS-1 that he would pay $300 per key code if CS-1 could obtain them.

### Examples of the Fraudulent Scheme in Operation

### FBI Undercover Purchase

22. On or about March 14, 2006, an undercover FBI agent placed an online order on the web site www.abovegroundsolutions.com for one piece of Microsoft SQL Server 2000 Standard Edition Full Retail software with 25 CAL licenses included and three pieces of Microsoft Windows Server 2003 5 CAL license packs, paying a total of $2069.97 to include shipping charges.

23. On or about March 23, 2006, I received one package via Federal Express. The package was shipped from AG SOLUTIONS, 390 S. Hauser Blvd., Tower 46, Apt. 8-D, Los Angeles, California 90036. The package contained one Microsoft SQL Server 2000 Standard Edition marked "Not for Resale" and three Microsoft Windows Server 2003 5 CAL license packs from AG SOLUTIONS.

24. The Microsoft SQL Server 2000 NFR product received from

AG SOLUTIONS was labeled as a "Microsoft Licensing" product and bolded text on the face of the CD reads "Not for retail or OEM Distribution. Not for resale." The SQL Server product had a non-Microsoft label attached that stated the product "includes 25 CD integrated SQL 2000 Standard Server Client Access Licenses."

25. AG SOLUTIONS' website, www.abovegroundsolutions.com, described the SQL Server 2000 Standard 25 CAL product purchased by the undercover agent as a "Full Retail Version" product. The image presented on the website of this product was also that of an actual full retail box package. The SQL Server product received from AG SOLUTIONS, however, was not a full retail version as represented on the web site. Rather, the product received was a set of infringing NFR software in sleeves without a retail box or packaging and without the 25 Client Access Licenses (CAL's).

26. The Microsoft Windows Server 2003 5 CAL license packs received from AG SOLUTIONS did not include the descriptive product labels or Certificate of Authenticity (COA) labels that are typically affixed to genuine license pack products by Microsoft.

27. On or about April 2006, I was contacted by Microsoft Representative Anita Rea who told me that Microsoft does not manufacture and/or distribute SQL Server 2000 products with integrated Client Access Licenses (CALs) and that all genuine Microsoft products sold with a CAL should include a separate

paper document license produced by Microsoft.

## U.S. Marine Corps Purchase

28. On or around January 2007, I interviewed Jo An Allen ("Allen"), an information technology specialist working in the United States Marine Corps ("USMC") Camp Lejeune Data Processing Unit about the above sales and learned the following:

   a. In or around 2005 and 2006, Allen made two purchases from AG Solutions via the Internet. The first purchase was for one Microsoft Office 2003 Professional Compact Disk (CD) set including a 500 user license and a volume license product activation key. The second purchase was for one Microsoft Office 2003 Professional CD set including a 250 user license and one volume license product activation key. The USMC paid GLADNEY $18,000 and $9,000 for each respective purchase and in each instance GLADNEY advertised the software licencing as being genuine.

   b. After the orders were placed, Allen received by Federal Express from 390 S. Hauser Blvd, Tower 46 Apt. 8-D, Los Angeles, CA 90036 (GLADNEY's business) two CD-Rom discs with both enclosed in protective sleeves. The CD sleeves had two small Avery-style labels affixed to it, one on the front and one on the back.

   c. For the 2005 sale, one label contained the words "Office 2003 pro 500-User Volume Licensed Version" and the other label contained a Product Key (GWH28-DGCMP-P6RC4-6J4MT-3HFDY).

14

   d. For the 2006 sale, one label contained the words "Office 2003 pro 250-User Volume Licensed Version" and the other label contained a Product Key (DBQ8B-CBTMR-29YWC-7YPGT-QTH3Y).

   e. Allen did not receive any other documentation or licencing.

  29. The Product Key codes provided to the USMC were submitted to Microsoft for analysis. On or around April 10, 2008, Microsoft Investigator Thomas Montgomery provided the following information:

   a. The product key code sent to the USMC in the 2005 sale (GWH28-DGCMP-P6RC4-6J4MT-3HFDY) was obtained from another customer who has a legitimate Volume License agreement with Microsoft and did not belong to either GLADNEY or to the USMC.

   b. The product key code GLADNEY sent to the USMC in the 2006 sale (GWH28-DGCMP-P6RC4-6J4MT-3HFDY) was counterfeit. This product key was not generated by Microsoft but was created by a key-code generating computer program.

   c. Microsoft Volume License Keys are unique activation codes. They are specific to the software product and are assigned to specific customers. Volume Licensed software media is only distributed to Volume License holders. There are no other legitimate sources of this software besides Microsoft.

   d. Microsoft has never entered into a Volume License Agreement with Adonis Gladney or his company, AG solutions. Microsoft never entered into a Volume License agreement with the

15

USMC for this purchase.

30. The USMC paid GLADNEY $27,000 for 750 user licenses to utilize Microsoft Office 2003 Professional on their information systems. GLADNEY did not provide any licencing to the USMC. The labels on the CD protective sleeves stating the CDs had 500 and 250 user licences, respectively are fraudulent. Microsoft does not provide volume licencing on printed Avery-style labels.

31. On April 19, 2006, I executed a Federal search warrant at the business premises of AG SOLUTIONS, which is also the residence of ADONIS GLADNEY. After execution of the search warrant, GLADNEY agreed to an interview. During the interview, I showed GLADNEY an invoice and he confirmed that it was for one of the two USMC software sales referred to above. GLADNEY admitted that he sent the USMC one CD set with a volume licence key code that could be used 250 times but that he had not sent the proper licensing documents. GLADNEY also admitted that he had paid $150 to $200 for the CD set that he sold to the USMC for $9,000. GLADNEY admitted that the activation key code he sent with the CD set could be used multiple times with different users and without a license.

32. GLADNEY also explained that his standard procedure for selling volume license or NFR products was to send the customer a CD that would install an unlimited number of times. GLADNEY would send these CDs with no CALs or licenses, but would charge the customer based on the number of licensed users they needed

16

for the product. GLADNEY stated that he would send customers the exact same CD set and key code, but would charge a higher price for the additional users. GLADNEY sold other server products in the same manner. He explained that the Microsoft server products he sold that were advertised with an integrated CAL did not actually include a CAL nor did GLADNEY send a CAL with the product. GLADNEY shipped customers the same CDs whether they ordered a 5 CAL or a 25 CAL product, but he labeled the products differently and charged more for the higher user CALs. GLADNEY admitted knowing that selling software in this manner was wrong.

### Conclusion

33. Based on the foregoing facts, I respectfully submit that there is probable cause to believe that ADONIS GLADNEY has violated 18 U.S.C. § 1341 (mail fraud) and 28 U.S.C. § 2461(c), 18 U.S.C. § 981(a)(1)(C), and 21 U.S.C. § 853 (criminal forfeiture).

_____
JASON N. SMOLANOFF
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed this _____ day of May 2008

_____
UNITED STATES MAGISTRATE JUDGE

17